# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **MOLLIE ANN GARRETT** | * | **CIVIL ACTION NO.  16-1698** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **NANCY W. BERRYHILL, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The District Court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Mollie Ann Garrett protectively filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on January 7, 2010. (Tr. 350-357, 386).[1]  She alleged disability as of November 15, 2007, because of severe depression, diabetes, breast cancer in 2008, and knee problems.  (Tr. 80, 390).  The state agency denied the claims initially and upon reconsideration.  (Tr. 102-105, 143, 151-155).  Thereafter, Garrett requested a hearing, which was held on April 6, 2011, before Administrative Law Judge

---

[1]  Garrett apparently filed a prior application in late 2007 or early 2008.  *See* Tr. 484.  By all accounts, it was denied at the stage agency level in February or March 2008, and apparently, not further appealed.  *See* Tr. 963-964.

("ALJ") Thomas Bundy.  (Tr. 37-52).  However, in an April 26, 2011, written decision, the ALJ found that Garrett was able to perform her past relevant work as a phone answering service attendant, and thus, was not disabled under the Act.  (Tr. 106-115).  Garrett petitioned the Appeals Council to review the unfavorable decision.  On June 18, 2012, the Appeals Council granted the request for review, vacated the ALJ's decision, and remanded the case for further proceedings consistent therewith.  (Tr. 119-122).

Pursuant to the order of remand, ALJ Mary Abbondelo held a second administrative hearing in the matter on December 12, 2012.  (Tr. 53-76).  On March 11, 2013, she issued a partially favorable decision, wherein she found the claimant disabled as of March 8, 2012, but otherwise not disabled prior to that date.  (Tr. 124-137).  Apparently dissatisfied with the ALJ's disability onset date,[2] Garrett again asked the Appeals Council to review the decision.  On May 13, 2015, the Appeals Council granted the request for review, vacated the entire ALJ decision (including the favorable portion), and remanded the case for further proceedings.  (Tr. 144-147).

On April 14, 2016, ALJ Robert Grant held a third hearing in the matter.  (Tr. 77-101).  In a May 27, 2016, written decision, the ALJ determined that Garrett was not disabled for the period at issue, finding at step four of the sequential evaluation process that she was able to return to past relevant work as a telephone operator.  (Tr. 14-29).

Garrett again petitioned the Appeals Council for review.  On October 12, 2016, however, the Appeals Council denied the request; thus, the latest ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On December 8, 2016, Garrett filed the instant complaint for judicial review of the

---

[2] *See* Tr. 457-458.

2

Commissioner's decision.  She alleges the following errors,

1.      The ALJ violated plaintiffs' right to due process of law by relying on post-hearing evidence which was never tendered to plaintiff or her counsel, and which the ALJ then relied on to support his finding that plaintiff is not disabled.

2.      The ALJ committed reversible error in placing any reliance on the consultative examination report of Dr. Morse, who relied on symptom validity testing, including the TOMMS and M-FAST which the Commissioner has since determined should never be purchased as such tests cannot prove whether a claimant is credible or malingering.

3.      The ALJ's finding that plaintiff's depression is nonsevere is not supported by substantial evidence.

4.      The ALJ's finding that plaintiff can return to her past relevant work as a telephone operator is not supported by substantial evidence.

5.      Because plaintiff cannot perform her past relevant work and is disabled under Grid Rules 201.06 or 202.06 even if she could perform sedentary or light work, the court should remand with instructions to award benefits.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards.  *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial

evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite

duration will not be found disabled.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*,  239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## **The ALJ's Findings**

## I.    **Steps One, Two, and Three**

The ALJ determined  at step one of the sequential evaluation process that Garrett did not engage in substantial gainful activity during the relevant period.  (Tr. 19).  At step two, he found that the claimant suffered severe impairments of diabetes mellitus and left knee degenerative

joint disease.  (Tr. 19-24).[3]  He concluded that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 24).

## II.     Residual Functional Capacity

The ALJ next determined that during the relevant period, Garrett retained the residual functional capacity ("RFC") to perform the full range of light work.[4]

## III.     Step Four

At step four, the ALJ employed a vocational expert to find that the claimant was able to return to her past relevant work as a telephone operator, both as she actually performed this job, and as it generally is performed in the national economy.  (Tr. 28).[5]

---

[3]  He further found that the claimant's alleged mental impairments and breast cancer were non-severe.  *Id*.

[4]  Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[5]  Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'"  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

### Non-Exhaustive Chronology of Relevant Medical Evidence

Garrett was hospitalized from May 23-26, 2007 for alcoholic pancreatitis, acute renal failure, diabetic ketoacidosis, and cocaine abuse. (Tr. 499-500).

On January 26, 2008, Garrett was seen by Roxanne Morse, Ph.D., at the request of the state agency in connection with her prior claim. (Tr. 544-548). Garrett reported that she was disabled because she was easily upset, had mood swings, and disliked being around people. *Id*. She stated that she developed a problem with depression in April 2007, shortly after she lost her job. *Id*. She also reported problems with cocaine, alcohol, and marijuana. *Id*. She claimed poor concentration and pervasive sadness. *Id*. She further reported some anxiety, irritability, plus auditory and visual hallucinations about two to three times per week. *Id*. She consumed alcohol every other day. *Id*. She occasionally used marijuana, and also used cocaine three to four times per month for the last four to five years. *Id*. She performed all of her activities of daily living. *Id*.

Morse observed that Garrett's gross motor functioning was unremarkable. *Id*. During the testing process, Garrett did not appear to display adequate effort and patience. *Id*. Nonetheless, she displayed adequate attention and concentration. *Id*. Her memory was grossly intact, but her judgment was limited. *Id*. Testing revealed a borderline intellectual functioning full scale IQ of 75. *Id*.

Morse noted that Garrett was malingering. *Id*. Her pattern of performance suggested deliberate misrepresentation of her cognitive abilities. *Id*. Thus, the test results were considered invalid. *Id*. Morse diagnosed Rule Out: depressive disorder, alcohol dependence, cannabis dependence, and opioid dependence. *Id*. Garrett also malingered cognitively and

psychiatrically. *Id*. Morse opined that Garrett was malingering her reports of psychosis and depression. *Id*. Given her scores on the malingering test, it was impossible to provide a definitive diagnosis of any valid psychiatric symptoms. *Id*. She was able to understand, remember and carry out simple, detailed, and complex instructions. *Id*. She was able to maintain attention and concentration. *Id*. She displayed pace and persistence. *Id*. She endured the stress of the interview. *Id*. Based on observations of then current behavior and reported history, her ability to interact with the public, supervisors, and co-workers remained unimpaired. *Id*.

On February 26, 2008, non-examining agency physician Archi Garcia, M.D., reviewed the record, including Dr. Morse's report, and opined that Garrett's mental impairments were non-severe. (Tr. 963-964). Similarly, non-examining agency physician, Roger Fast, M.D., reviewed the record in January-February 2008, and opined that Garrett's physical impairments were non-severe. (Tr. 964-965).

On October 22, 2008, oncologist, Michael Williams, M.D., noted that Garrett stopped working because of problems with her diabetes. (Tr. 569-572). Williams noted that Garrett described herself as having depression and anxiety with problems thinking and remembering. *Id*.

At a November 12, 2008, oncology follow-up visit, Garrett reported no joint pain or swelling, and no psychological symptoms. (Tr. 566-567).

On February 26, 2009, Garrett returned to Dr. Williams at the oncology clinic. (Tr. 562-564). At that time, her main concern was depression. *Id*. She had started Prozac about one week earlier. *Id*. She complained of right pelvic pain, which was characteristic of a bicycling injury. *Id*. Williams noted that Garrett rode her bicycle "all over the place." *Id*. Her joints were

8

non-tender with no swelling.  *Id*.

On April 23, 2009, Garrett reported that she had right hip pain, but no other complaints. (Tr. 558-560).  Upon examination, her joints were non-tender, with no swelling.  *Id*.  CT scan of the right hip showed no abnormality.  *Id*.

On June 11, 2009, Garrett reported no joint pain, swelling, muscle pain, or weakness. (Tr. 553-555).  Upon examination, her joints were non-tender with no swelling.  *Id*.

On September 3, 2009, Garrett returned for oncology follow-up.  (Tr. 550-551).  She had no signs of recurrent breast cancer.  *Id*.  However, she had resumed drinking.  *Id*.  She had no joint pain or swelling, muscle pain, or weakness.  *Id*.  Upon examination, her joints were non-tender, with no swelling.  *Id*.  Dr. Williams diagnosed stage I breast cancer, right inquinal pain - resolved; and alcoholism.  *Id*.

On October 16, 2009, Garrett went to the emergency room with complaints of pain and swelling to her left knee for the past three weeks secondary to a fall.  (Tr. 597).  X-rays showed mild degenerative changes, but no significant joint effusion.  (Tr. 598).

On November 1, 2009, Garrett returned to the emergency room with complaints of mild to moderate pain to the left knee.  (Tr. 600)  She reported that the pain began when she fell about one month earlier.  *Id*.

On February 10, 2010, the orthopedic clinic noted that x-rays showed mild degenerative changes of the left knee with no erythema and possible mild swelling.  (Tr. 654).[6]  She exhibited

---

[6]  A February 10, 2010, x-ray of both knees showed extensive calcifications of the medial collateral ligament bilaterally.  (Tr. 665).  There were no significant arthritic changes of the knee joint, and no other abnormalities.  *Id*.  Findings were consistent with old injuries of the upper portion of the medial collateral ligaments of the knee.  *Id*.

full range of motion, but painful flexion. *Id*.

On February 17, 2010, Garrett returned to the orthopedic clinic. (Tr. 653). She was non-compliant with her insulin. *Id*.

On March 29, 2010, Garrett reported that she was not in any pain. (Tr. 635).

On June 29, 2010, Garrett was examined by D. L. Moore, Ph.D., at the request of the state agency. (Tr. 606-611). Moore noted that Garrett's records reflected malingering. *Id*. Moore observed that Garrett's hygiene and grooming were excellent. *Id*. There were no apparent problems with sitting, standing, or walking. *Id*. Her gait was unremarkable. *Id*. Garrett reported past use of marijuana and cocaine. *Id*. She checked 71 percent of items on the symptoms questionnaire as descriptive of her. *Id*. She claimed onset of symptoms two years previously. *Id*. Her concentration/attention were good. *Id*. Her memory generally was good. *Id*. Garrett displayed no anxiety at any time during the examination. *Id*. Her mood, however, was irritable. *Id*. Cooperation, persistence, and pace were good. *Id*. Her evaluation was thought to be valid, and her adaptive behavior average. *Id*. Allegations of depression were not substantiated. *Id*.

Moore surmised that Garrett continued to use marijuana, and that if so, her irritability may be substance related. *Id*. Moore opined that Garrett should experience no significant difficulty following multi-stage directions, and no problems adjusting to the demands of the average work place. *Id*. However, instability of mood might lead to frequent conflict between Garrett and her fellow employees, especially if she abused marijuana. *Id*. Learning new tasks also might be moderately difficult due to her probable borderline intellectual functioning. *Id*. Her ability to maintain an adequately productive pace was considered good. *Id*. Moore

10

diagnosed mood disorder, NOS, and borderline intellectual functioning. *Id*.

On July 7, 2010, non-examining agency psychologist, Cheryl Marsiglia, Ph.D., completed a psychiatric review technique form indicating that Garrett suffered from borderline intellectual functioning and a mood disorder. (Tr. 614-627). She found that the impairments resulted in moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. *Id*. Therefore, the impairments were considered severe.

Marsiglia also completed a mental residual functional capacity assessment form in which she indicated that Garrett was moderately limited in her ability to understand, remember, and carry out  detailed instructions. *Id*. She also was moderately limited in her ability to maintain attention and concentration for extended periods, and to complete a normal workday without interruptions from psychologically based symptoms. *Id*. Her ability to interact appropriately with the general public, supervisors, and co-workers was moderately limited, as was her ability to respond appropriately to changes in the work setting. *Id*. Marsiglia concluded that Garrett appeared to retain the capacity for simple work. (Tr. 628-631).

Garrett was hospitalized from July 7-16, 2010, with diabetic ketoacidosis. (Tr. 673-676). She reported that she had been off of her insulin for one month. *Id*. At that time, she exhibited full range of motion in all joints, with no pain. *Id*.

On August 14, 2010, at the request of the state agency, Garrett underwent a consultative physical examination administered by Amy Rowell, M.D. (Tr. 667-671). Garrett reported that her diabetes was very poorly controlled, despite taking her medication and watching her diet. *Id*. She felt light-headed and could not concentrate. *Id*. She described severe problems with depression and anxiety. *Id*. She also reported left knee pain from a fall that occurred one year

earlier. *Id*. Garrett said that the pain was constant, and prevented her from fully bending and extending the knee. *Id*. She denied any use of alcohol, tobacco, or illegal drugs. *Id*. She ambulated without assistance. *Id*. Upon examination, there was pain with movement of the left knee and associated joint effusion, but her gait and station were normal. *Id*. She was able to bend and squat without difficulty. *Id*. She did not appear depressed or anxious. *Id*. Her recent and remote memory remained intact. *Id*. She had good insight and cognitive function. *Id*.

Rowell diagnosed breast cancer, in remission; depression; diabetes; and arthritis. *Id*. She noted that Garrett's left knee was painful, with evidence of an effusion, but her range of motion and gait were normal. *Id*. Rowell remarked that Garrett had significant symptoms of depression, and that further psychological testing might be necessary. *Id*. Nonetheless, Rowell opined that Garrett should be able to sit, walk, and/or stand for a full work day, lift/carry objects without limitations. *Id*.

On July 6, 2012, Garrett complained of left knee pain at E.A. Conway Medical Center. (Tr. 716). However, the knee was non-tender to palpation and did not display any crepitus upon passive or active range of motion of the knee. *Id*. An x-ray taken in January showed no abnormalities of the joint. *Id*.

On September 8, 2012, Garrett was seen by David Williams, Ph.D., for a psychiatric diagnostic interview examination. (Tr. 702-708). Garrett reported that she was unable to work because of her depression, and felt useless. *Id*. She had trouble taking four shots of insulin each day. *Id*. She also reported problems with her left knee and described her pain as a 7/10, and constant. *Id*. She had crying spells, and did not want to be around anyone. *Id*. Her sleep improved with medication, but her knee pain tended to wake her up several times per night. *Id*.

12

Garrett reported that she had been struggling with depression since 2008-2009, and that the course of the disorder had been continuous and steady. *Id*. Some days were better than others. *Id*. She stayed in bed about half the time. *Id*. Williams noted a mild impairment in activities of daily living, and moderate impairment in social functioning. *Id*. Garrett also had a significant impairment in interpersonal relations. *Id*. She reported that she had never been fired from a job, but was laid off due to cut backs. *Id*. She consumed twelve ounces of beer each day. *Id*. She stated that she last used cocaine three years earlier, and last used marijuana in 2011. *Id*.

Williams diagnosed major depressive disorder, single episode, severe, without psychotic features; "Personality Traits/Coping Style Affecting Medical Condition of Diabetes"; and assigned a current GAF of 45. *Id*. Williams noted that mental status examination revealed depressed mood, pain related behavior, and psychomotor retardation. *Id*. Understanding was intact; concentration, pace, and persistence were mildly limited by depression. *Id*. Social skills were adequate. *Id*. Her ability to manage stress was somewhat limited on interview, but significantly limited on the whole. *Id*. Social activities were impaired. *Id*. He observed that Garrett was a credible claimant. *Id*.

Williams also completed a medical source statement in which he indicated that Garrett had marked limitations in interacting with public, supervisors, co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 709-711). He noted that her social skills were fine, but she was isolated from others. *Id*. He added that there was no way to assess for social isolation outside of observing her at her home or by accepting her self-report. *Id*.

On March 5, 2013, Garrett's treating physician, Amy Givler, M.D., diagnosed arthritis,

depression, diabetes mellitus, tobacco abuse, hypertension, and lipid disorder.  (Tr. 731-735).  As for borderline intelligence, Givler could not tell whether Garrett was amplifying her low level of functioning.  *Id*.  She seemed to take care of herself, and had excellent grooming and good organizational skills.  *Id*.  Givler wondered if Garrett's long-term marijuana use made her mentation more sluggish.  *Id*.  She denied current use, other than "a few puffs" two weeks earlier.  *Id*.  Givler increased her Prozac and advised her to stop all marijuana use and smoking.  *Id*.  She also urged her to increase her physical activity.  *Id*.  Givler reviewed Garrett's psychological evaluations from 2010 and 2012, and characterized them as "excellent."  *Id*.

Medical records from April 2, 2013, reflect that Garrett drank fourteen cans of beer and one glass of wine per week. (Tr. 738).  Upon examination, she had a normal range of motion, with no edema and no tenderness.  *Id*.

Garrett returned to Dr. Givler on September 17, 2013.  (Tr. 743-747).  Givler noted remarkable difference in her affect.  *Id*.  Garrett admitted that she was so depressed at her last visit that she could not think straight.  *Id*.  She felt great this time, however.  *Id*.  Garrett said that she stopped marijuana except for two puffs, two weeks earlier, which she vowed to try not to repeat.  *Id*.  *Garrett acknowledged that marijuana cessation probably contributed to her clearer thinking*.  *Id*.

On January 21, 2014, Givler noted that Garrett refused to have blood drawn.  (Tr. 766).  No marijuana use, but she still was smoking.  *Id*.  Givler again instructed her to increase her physical activity.  *Id*.

On May 20, 2014, Garrett returned to Dr. Givler.  (Tr. 777-781).  Her pain was under fair control.  *Id*.  Givler noted that Garrett had not used illicit drugs in a "long time," and asked to

14

have "substance abuse" removed from her problem list.  *Id*.  This proposal sounded reasonable to Givler.  *Id*.

Garrett was hospitalized for three days on August 11, 2014, for diabetic ketoacidosis. (Tr. 786).

Garrett returned to Givler on September 22, 2015.  (Tr. 845-848).  Garrett admitted that she was drinking and smoking – despite instructions to the contrary.  *Id*.

## Analysis

### I.     Step Two/RFC

For various reasons, plaintiff contends that the ALJ erred when he determined that plaintiff's mental impairments were non-severe.  In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."  *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)).  However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential evaluation process, strict adherence to *Stone* and its requirements is not required.  *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, n. 1 (5th Cir. 1987).

Rather, under these circumstances, the effect of the ALJ's step two determination is measured by whether his step three finding and RFC are supported by substantial evidence.  This is so because once at least one severe impairment is determined to exist, all medically determinable impairments must be considered in the remaining steps of the sequential analysis.

*See* 20 C.F.R. §§ 404.1545, 416.945.  Indeed, the ALJ recited the foregoing regulation, and proceeded to consider the medical record and the aggregate impact of plaintiff's impairments. *See* Tr. 18-28.

Garrett does not contest the ALJ's determination that her impairments do not meet or equal a listing at step three.  Thus, the critical issue becomes whether the ALJ's residual functional capacity assessment is supported by substantial evidence – in particular, his determination that plaintiff's mental impairments did not reduce her capacity for work.

The ALJ essentially grounded his assessment of plaintiff's mental impairments on the January 26, 2008, consultative psychological examination administered by Roxanne Morse, Ph.D.  Plaintiff contends that the ALJ erred in doing so because Dr. Morse's examination included symptom validity testing ("SVT"), which, since as early as 2013, the Commissioner ceased purchasing as part of a consultative examination.  *See* Commissioner's Program Operations Manual System ("POMS") DI 22510.006(D) WHEN NOT TO PURCHASE A CONSULTATIVE EXAMINATION (CE).  However, POMS DI 22510.006 further states that "[w]hen the results of SVT are part of the medical evidence of record, we consider them along with all of the relevant evidence in the case record."  *Id*.  That is precisely what the ALJ did in this case.

In any event, Dr. Morse primarily used the SVT to discount the validity of Garrett's cognitive functioning tests.  However, even if plaintiff suffered from borderline intellectual functioning – as later psychologists found – this often is caused by an intellectual disorder (in the absence of some traumatic or precipitating event), which requires manifestation before age 22. *See* Section 12.00(B)(4), Appx. 1 Subpart P.  Certainly, if plaintiff suffered sub-average intellectual functioning for all of her life, then the impairment did not affect her ability to

16

perform her past relevant work – at least as she actually performed the job.[7]

Dr. Morse's opinion is more significant for her other findings.  For instance, plaintiff was able to maintain attention, concentration, pace and persistence.  (Tr. 548).  She also handled the stress of the interview, and "*[b]ased upon observations of current behavior and reported history* the claimant's ability to interact with the public, supervisors, and coworkers appears to be unimpaired."  *Id.* (emphasis added).  According to Morse, it does not appear that the SVT was the motivating basis for these additional findings.[8]

The obvious difficulty with Dr. Morse's opinion is that it was issued in January 2008, and the period under consideration extends for more than eight years later until May 2016.  In the intervening period, plaintiff's physicians began treating her depression with Prozac.  She also underwent two more consultative psychological examinations.  In 2010, Dr. Moore examined plaintiff, considered the record (including Morse's prior  findings of malingering), but opined that instability of mood might lead to frequent conflict with her fellow employees, especially if she abused marijuana.  The non-examining agency psychologist, Dr. Marsiglia, reviewed Dr. Moore's findings, and completed an RFC form that included, *inter alia*, *moderate* limitations in

---

[7]  Of course, if plaintiff's cognitive impairment (if any) stemmed from her long-time marijuana use, then that raises a separate issue.  *See* discussion, *infra*.

[8]  Plaintiff also argues that the ALJ violated her due process rights by including additional post-hearing evidence without notifying her and affording her the opportunity to address the evidence.  Even so, however, plaintiff still must demonstrate resulting prejudice. *Curtis v. Commissioner Social Sec. Admin.*, 2008 WL 919692 (W.D. La. Feb. 27, 2008) (citing *Ka Fung Chan v. INS*, 634 F.2d 248, 258 (5th Cir.1981) (must show substantial prejudice in order to prove denial of due process in an administrative proceeding)).  Here, the three pages of evidence included the opinions of non-examining agency physicians issued in 2008 for purposes of plaintiff's prior application(s).  (Tr. 963-965).  The opinions of the physicians are cumulative and redundant in light of similar findings by the examining consultative providers, Drs. Morse and Rowell.  Thus, any error was harmless.

her ability to interact appropriately with the general public, supervisors, and co-workers.

Also in 2010, consultative physical examiner Dr. Rowell remarked that Garrett had significant symptoms of depression, and that further psychological testing might be necessary.

In 2012, consultative psychologist David Williams examined Garrett and noted moderate limitation in social functioning.  In fact, he completed a medical source statement that included, *inter alia*, *marked* limitations in interacting with public, supervisors, and co-workers.

In his decision, the ALJ purported to assign "significant evidentiary weight" to Dr. Moore's findings, subject to, as he put it, "one glaring exception":  Moore's diagnosis of borderline intellectual functioning.  (Tr. 21-22).  As discussed, *supra*, however, borderline intellectual functioning stemming from a longstanding intellectual disorder is not particularly significant if the claimant's RFC otherwise permits a return to her past relevant work – as she actually performed it.  More troublesome, however, are the limitations on social functioning[9] recognized by Dr. Moore and as quantified by Dr. Marsiglia.  The ALJ proffered no rationale for discounting these limitations.  *See* Tr. 21-23.

The court emphasizes that although "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion,"[10] the ALJ cannot reject a medical opinion without an explanation supported by good cause.  *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).   Moreover, the ALJ cannot simply "pick and choose" only the evidence that supports his position.  *Id*.  (citations omitted).

---

[9]  Especially when, as here, there is some evidence that these limitations fully manifested themselves or worsened post-alleged onset of disability.

[10]  *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation and internal quotation marks omitted).

In addition to all but ignoring the social limitations of functioning endorsed by Drs. Moore and Marsiglia, the ALJ endeavored to discount the marked limitations of social functioning recognized by Dr. Williams because they were inconsistent with the detailed results of his associated mental status evaluation. *See* Tr. 22. Even, so, however, Dr. Williams still noted moderate impairment in social functioning during his examination. (Tr. 703). Nonetheless, the ALJ did not account for this moderate limitation of functioning.

In sum, the court finds that the ALJ failed to provide good cause for rejecting all of the limitations recognized by the consultative psychologists. The un-discounted portions of the consultative psychologists' findings, combined with evidence from plaintiff's treating physicians that her mental impairment(s) coalesced or progressed over time such that it resulted in cognizable social limitations of functioning undermines the ALJ's RFC that plaintiff's mental impairments did not cause any limitation of functioning throughout the relevant period. Therefore, the court is constrained to find that the ALJ's RFC is not supported by substantial evidence.

## II.    Step Four and Remand

The ALJ ostensibly rested his step four determination on the testimony of the vocational expert. According to the ALJ, the VE testified that a hypothetical claimant with the plaintiff's vocational background and RFC would be able to perform her past relevant work as a telephone operator both as actually, and as generally performed. (Tr. 28). As it turns out, the VE did not testify to anything of the sort. (Tr. 97-100). The hypotheticals posed by the ALJ assumed a claimant limited to simple work with one or two-step instructions, to which the VE replied that the limitations precluded plaintiff's past relevant work as a telephone operator. *Id*.

19

In addition, plaintiff testified that for her past relevant work of answering service operator, she was required to supervise two to three employees throughout the shift.  (Tr. 412). This evidence suggests that if she had significant social limitations of functioning she would not be able to perform this prior work – even as she performed it.

In short, because the foundation for the ALJ's step four determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, also is not supported by substantial evidence.

Plaintiff argues that if she is unable to return to her past relevant work, then given her age, her other vocational factors, and an exertional capacity for no more than sedentary or light work, a finding of disabled necessarily follows under the guidelines at step five of the sequential evaluation process.  The undersigned observes that courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. §405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*,  750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.  First, plaintiff's RFC remains indeterminate. Second, even if plaintiff's mental impairments were to limit her to no more than occasional

20

contact with supervisors, co-workers, and the public, there is evidence that she could perform her prior job of data entry clerk, which appears to have been performed from 1997-1998, potentially within 15 years of June 30, 2012 – the date that she last was insured for Title II benefits.  *See* 20 C.F.R. § 404.1565(a).[11]  Third, there is some indication in the record that plaintiff's mental impairments might be related to her long-term marijuana use.  *See* Tr. 606-611.  Under the Social Security Act, as amended, an individual will not be considered disabled for purposes of disability insurance benefits if alcoholism or drug addiction was a contributing factor material to the Commissioner's determination that the individual is disabled.  42 U.S.C. § 423(d)(2)(C).  "Drug or alcohol abuse is material to a disability if the ALJ would not 'find [the claimant] disabled if [the claimant] stopped using drugs or alcohol.'"  *Brown v. Apfel*, 192 F.3d. 492, 499 (5th Cir. 1999) (quoting, 20 C.F.R. § 416.935(b)(1)).  Upon remand, and as warranted, the Commissioner may develop this issue via medical expert evidence and/or consultative examination.[12]

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

---

[11]  Albeit, for purposes of her Title XVI claim, that job was performed more than 15 years before the date of the decision.  *See* 20 C.F.R. § 416.965.

[12]  Plaintiff suggests that it would be "unconscionable to remand this almost eight year old case where the record is fully developed."  (Pl. Reply Brief, pg. 5).  As discussed above, however, the record remains indeterminate.  Moreover, it is the court's understanding that plaintiff has elected to continue receiving benefits pursuant to her vacated partially favorable award, while she continues to pursue her claims.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 8th day of February 2018.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE